Lobing, J.,
delivered the opinion of the court:
The statement of facts finds that the claimant, a subject of and resident in Great Britain, during the rebellion, imported goods not munitions of war into the ports of the confederacy. But this was not in him any offense against any law to which he was subject. He was a citizen of a neutral nation, and the law which made the rule and the rights between him and the United States was the law of nations; and under the law of nations, as contended by the claimant’s counsel and shown by the authorities he cited, a belligerent cannot prohibit neutrals from trading with its enemy; it can only prevent it; and the difference is very wide, for it involves the right of neutrals to trade with either belligerent, and that right is as clear and certain as it is important to the world’s commerce; and a belligerent can only prevent neutrals from trading with its eneiriy by a blockade efficient for prevention. That is the absolute condition *448 annexed by the law of nations to the use of a blockade ; and by its careful discrimination between a paper-blockade, which it disclaims and denies, and an actual blockade, which it alone permits, the law-of nations says to the belligerent you may keep the neutral vessel out if you can, and it says to the neutral vessel you may get in without force if you can. It thus gives to-each a clear and definite right; and this petitioner, in import-in the exercise of his right under the law of nations as the ing his goods into the port of the confederates, was as much United States were in the exercise of their right in attempting to prevent it. And the fact that the petitioner succeeded in the importation of his goods is evidence that under the law of nations he had a right do so, because it is evidence of the fact, that the United States had not performed the condition on which only under the law of nations they had a right to blockade at all, i. e., by establishing a blockade efficient for prevention. The proposition of Lord Stowell as to the required completeness of a blockade is of universal admission, and he said as follows: “ The very nature of a complete blockade includes that the besieging force can apply its power to every point of the blockaded state. If it cannot, then there is no blockade of that part where its power cannot be brought to bear.’’ (1 Bob., 80 ; 4 Bob., 66; 1 Acton, 64.)
It is true that a neutral vessel, in attempting to enter a blockaded port, is liable to seizure, but that seizure is not made under the municipal laws of the blockading power, nor for any offense against them, but by its right as a belligerent and under the law of nations, which authorizes it to treat, not as a criminal, but as an enemy, those who come to the aid of its enemy.
We are, therefore, not dealing here with a criminal or an offender against our laws or any laws, but with one who has exercised his right as a neutral by importing merchandise, not munitions of war, into ports of the Confederacy, when and where he had the right of entry under the law of nations.
And those laws are a part of the laws of the land, and they involve its highest policy, that of maintaining its good faith and good repute among the nations. And the maintenance of these is the highest duty that can be committed to a judicial tribunal. And that duty belongs to legislatures as well$ and therefore a municipal law punishing, directly or indirectly, treasonable offenses as such, must, by construction, be confined in its apxili- *449 cation to-our.own citizens or aliens resident here, wbo thereby owe allegiance here.
Nor can there be imputed to the claimant any intent of violating our municipal laws, or anything more than the fact of aiding the rebellion without that intent; for his intent in importing goods not munitions of war was his own gain in a trade lawful to him by the law of nations, and which trade is so made lawful to him because its intent is the. profits of trade, and not the assistance of one of two belligerents.
And the petitioner did not seek to avoid duties or the payment of any legal burdens on his traffic, and it cannot be assumed that he failed to comply with the existing requirements of the ports into which he entered; and if the authorities there were other than those of the United States, it was not his fault.
Neither is the petitioner at our bar by any grace, sufferance, or comity, but by his right, secured to him by our statute of July 28, I860, in exchange for the right 1ns sovereign gives to our citizens to sue him in his courts. And this right has been assured to him by our decisions, affirmed by the Supreme Court, under which our Government is held to be a trustee for aliens as well as for our own citizens.
It may be true that our Government did not, in matters between them and the citizens of the Confederacy, admit them in all respects to be belligerents. But it certainly is true that foreign nations, and England among them, both for their government and citizens, recognized the Confederates as belligerents, and established their relations with them accordingly; and if our Government objected to this diplomatically, it never practically enforced its objection; and it was, so far as Great Britain was concerned, definitively abandoned in final settlement by the treaty of Washington. And that during the rebellion the Confederates were belligerents cannot now be brought into question with the English government or an English subject.
Thus much for the status of the petitioner at our bar.
The facts in this case sever the crime of aiding the rebellion from the act of aiding it. They are entirely distinct things, and, as this case shows, have no necessary co-existence, and their difference and distinctness are recognized under all law and in all courts, civil and criminal. The law of nations recognizes the difference in holding that, where the citizen of a neu *450 tral nation gives aid and comfort to one of two belligerents, tlie other may treat him as its enemy under the laws of war, and not as a criminal under its municipal law. So all criminal courts distinguish between the act and the crime, which is only the moral and legal quality of the act, for in criminal courts pardon purges the crime, and absolves the criminal from its penal consequences; but it does not alter the act, for a thing done is unalterable, and no lfiw or court feigns imperception of that, or rests its action on the fiction of an impossibility. So all civil courts, in their administration of the law, distinguish between the act and the crime; for, if a man forges my name to a promissory note, and is pardoned for it, his crime is purged, and, as it is metaphorically said, thereafter no court can see it. But the court can and will thereafter see the act; for, if- the man sues me on the note, I may plead and prove the forgeiy, and certainly the replication of a pardon would be demurrable and bad in law.
And the language of all text-books and decisions distinguishes between the act and the crime, for they habitually and in the common accuracy of expression confine the absolving power of a pardon to the crime and its penal consequences. Thus Justice Blackstone (4 Black. Com., p. 402) says: “ Pardon makes the offender a new man, and acquits him of all corporal penalties attached to that offense for which he obtained pardon.” And offense, when used in reference to pardon, necessarily means crime. So Bacon’s Abridgment (v. 7, p. 416) says: “ Pardon removes not only punishment, but all the legal disabilities of crime.” And the language of decisions is as precise. In 7 Peters, page 150, Chief-Justice Marshall defined a pardon thus: “ A pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual from the punishment the law inflicts for a crime he has committed.”
It would seem to be necessarily certain that the Supreme Court, in its decisions that the words in the Act 12th March, 1803, “ never given aid and comfort to the rebellion,” referred to the crime, did not, and could not, overlook a difference so manifestly existing in fact, and so clearly stated in elementary treatises and authorities, and so certain to occur in practice; and the cases that they have decided show that they did not.
Thus in the case Ex-parte Garland the Supreme Court said: *451 “ A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is fall, it releases the punishment and blots out the existence of the guilt, so that, in the eye of the law, the offender is as innocent as if he had never committed the offense.” And again they said, in the same case: “ The effect of this pardon is to relieve the petitioner from all penalties and disabilities attached to the offense of treason committed by participation in the rebellion. So far as that offense is concerned, he is thus placed beyond the reach of punishment of any kind.” It would be certainly difficult to select language which would more clearly distinguish between the crime pardon will legally purge and the act that is unalterable. The industry of the learned counsel for the defendants has found the only case in which the language of the court has not distinguished between the act and the crime; and in that case they co-existed, and there was no need of distinguishing between them. In Carlisle & Henderson, (16 Wall., p. 147,) the court said in one sentence thus : u The pardon and amnesty do not and cannot alter the fact that aid and comfort were given by the claimants, but they forever close the eyes of the court to the perception of that/aci as an element iu its judgment.” But all the language of the Supreme Court in that case must be .construed together. And in a subsequent part of the case, on the same page, the court refers to the effects of pardon as to which its members agree and to those as to which they differ, and the statement is as follows: “ There has been some difference of opinion among the members of the court as to cases covered by the pardon of the President, but there has been none as to the effect of and operation of a pardon in cases where it applies. All have agreed that the pardon not only releases the offender from the punishment prescribed for the offense, but that it obliterates, in-legal contemplation, the -offense itself..”
Now, in the sentence first cited from this case of Carlisle & Henderson, the Supreme Court says: “ The pardon and amnesty do not alter the actual fact,” and in the sentence secondly cited they say that the court all agree that pardon “ obliterates the offenseand we think that in this case cited, and all the like cases decided by the Supreme Court, their language shows that they distinguished between the act and the crime, and held that the third section of the statute referred to the crime and *452 that only; for in every case in which, the Supreme Court has decided that a claimant, because of his pardon, was entitled to recover, the fact that he aided the rebellion was clear and unaltered, and yet by the decision formed no impediment to his recovery.
And in Pargoud’s Case, where pardon had obliterated the crime and the unalterable fact was all that remained, we held it was efficient per se to prevent a recovery, and the Supreme Court reversed our decision.
By the decision of the Supreme Court, pardon obliterates the crime and proves its non-existence, and thus supports the allegation a claimant is obliged to make in his petition and prove on trial, viz, that he “ never gave aid and comfort to the rebellion;” and that is all the pardon does. But pardon is only one way of proving the non-existence of crime, and another equally legal and efficient way is to prove by circumstances that the claimant could not have committed the crime; and that is done here, for it is shown that this claimant, at the time of his importations and since, was a subject of Great Britain and resident therein, and owed allegiance there, so that his act was not by our law treasonable, and under the law of nations was not criminal.
The argument for the defendants is that the third section of the Act March 12,1863, conditions a recovery under it on proof that a claimant never gave aid and comfort to the rebellion; that it is proved the claimant gave such aid and comfort, and that he had not been released of its consequences by any Executive pardon. As allegations of fact this is all true, but we think the defect of the proposition, as an argument, is that as such it rests on the literal meaning of the words “ never given aid and comfort to the rebellion,” instead of on their legal meaning and the legislative intent in their uses, and these are conclusively fixed for us by the decisions of the Supreme Court, by which the words cited are referred to the crime and not to the act of aiding the rebellion.
And the application of the argument of the defendants that we are called upon by them to make is, to refer the words of the statute, as to aid and comfort to the rebellion, in the cases of our own citizens and aliens resident here and owing allegiance here, exclusively to the crime and not at all to the act; and in the case of aliens, not resident here and not owing allegiance *453 here, exclusively to the act and not at all to the crime. And certainly that is the only way of bringing this action within the bar set up for the defendants. But we think the rules of construction require us to construe the words of the statute in the same way as to all persons.
As suggested' at the bar, the original theory of this court was that the jurisidiction of the crime of aiding the rebellion was given to other courts of the United States of criminal jurisdiction, and under other statutes than that of 12th March, 1863, and that this court of civil jurisdiction had nothing to do under that act but to find a 'fact on which was conditioned the return of property, vested in the United States by capture jure belli, to its original owners. But this theory has been reversed in all its parts by the Supreme Court, which has decided that the Act 12th March, 1863, requires us to find the crime of aiding the rebellion. And we think this confines the application of the statute to those owing- allegiance here. And whether in the decisions of the Supreme Court the crime of aiding the rebellion has or has not been considered apart from the act, they must be considered apart here, for the facts so present them. And it being now the settled doctrine that the statute contemplated the crime aud barred recovery as a punishment for that, we think the reasonable inference is that Congress did not intend to punish for treason a foreign subject because he had used his right as a neutral under the law of nations.